J-S15009-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JACQUELINE COSBY | : | |
| | : | |
| Appellant | : | No. 2057 EDA 2021 |

Appeal from the Judgment of Sentence Entered September 7, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0003102-2019

BEFORE:  NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 21, 2022**

Appellant Jacqueline Cosby appeals from the judgment of sentence imposed following her summary convictions for disorderly conduct and harassment.[1]  Appellant challenges the trial court's competency determination and the sufficiency of the evidence supporting her conviction for disorderly conduct.  We affirm.

Briefly, Appellant was charged with harassment and disorderly conduct based on allegations that she threatened Charles Palmer and members of his

---

[1] 18 Pa.C.S. §§ 5503(a)(4) and 2709(a)(4), respectively.

family throughout 2019.[2]  The trial court summarized the procedural history

of this matter as follows:[3]

> Trial was initially scheduled for December 9, 2019.  Over the course of the next 11 months[,] multiple continuances were granted so that Appellant could undergo a mental health evaluation and counsel could receive a mental health report to provide to the court.  On November 18, 2020, defense counsel, Bradley Bastedo, Esq., filed and provided this court with a Psychological Evaluation of Appellant by Allan M. Tepper, J.D., Psy.D.  In said evaluation, dated November 10, 2020, Dr. Tepper opine[d] that Appellant can be diagnosed with an Unspecified Bipolar and Related Disorder and an Unspecified Depressive Disorder.  Dr. Tepper also opine[d] that:
>
>> [Appellant] has a rudimentary understanding of the functioning of the courtroom personnel.  She is aware of the criminal charges that have been lodged against her.  She is aware of the trial process.  She is capable of distinguishing between the roles of the judge, jury, defense attorney, and prosecuting attorney.  Presently, however, [Appellant's] emotional state is interfering with her ability to cooperate with an attorney in reviewing her case and preparing a rational defense.
>
> **See** D-1, Allan M. Tepper, J.D., Psy.D.'s Psychological Evaluation Follow-up Meeting with Jacqueline Cosby, [at] 2.
>
> Accordingly, on November 18, 2020, this court granted Appellant another continuance to March 3, 2021.

---

[2] Appellant was originally charged with harassment, disorderly conduct, and stalking, all of which were graded as misdemeanor offenses.  However, prior to trial, the Commonwealth *nolle prossed* the stalking charge and amended the grading of the harassment and disorderly conduct charges to summary offenses.

[3] We note that in its Pa.R.A.P. 1925(a) opinion, the trial court also discussed Appellant's conviction for summary disorderly conduct at a separate docket number which involved a different victim.  However, Appellant did not file a notice of appeal from that conviction.  Therefore, that separate matter is not before us, and we will not address it in this memorandum.

On March 3, 2021, this court advised Appellant in open court that this case would now be fixed for trial on May 5, 2021. On May 5, 2021, Appellant failed to appear for trial. Defense counsel represented that Appellant was not competent to stand trial and thus this court continued the case. This court set a new trial date of June 21, 2021, and advised counsel that the court would issue an order directing Appellant to report to Lenape Crisis Center at the Lower Bucks County Hospital by 12:00 p.m. on May 7, 2021 to undergo a mental health evaluation.[4,5] On May 6, 2021, this court issued said order memorializing the direction announced in court on May 5, 2021.[6] On June 10, 2021, this court held a conference with both prosecution and defense counsel. Per said

---

[4] At the start of the hearing, defense counsel explained that he received several text messages from Appellant at five o'clock that morning. Appellant had stated that she would be unable to appear for court because she was having financial difficulties and could not afford to fill her car with gas. *See* N.T., 5/5/21, at 4. Appellant had also indicated that she was caring for her juvenile son, whose cancer had recently returned. *Id.* 4. Defense counsel stated that he had instructed Appellant to "sit tight," told her that he would attempt to conference her into the hearing over the phone, and expressed that both he and Dr. Tepper were concerned that she "needed help" because "[t]he stressors and everything [were] building up." *Id.* at 5.

After defense counsel called Appellant and placed her on speaker phone, the trial court explained that rather than issue a bench warrant for Appellant's failure to appear at the hearing, the trial court would order her to report for a mental health evaluation. *Id.* at 18. Specifically, the court stated: "You will report for an evaluation. You will comply with whatever treatment recommendations they offer, and then we'll be in a position to bring this case to court and you will have full due process." *Id.*

[5] The trial court issued a continuance order which stated that Appellant was "unavailable because [she was] not competent to stand trial today. [Public Defender] directed to prepare order for [Appellant] to report to Lenape Crisis Center at Lower Bucks County Hospital May 7, 2021 [at] noon for a [mental health] evaluation." *See* Trial Ct. Order, 5/5/21.

[6] The order directed Appellant to report to Lower Bucks Crisis Service of Lenape Valley Foundation for "a mental health evaluation/assessment" no later than noon on May 7, 2021. *See* Trial Ct. Order, 5/6/21.

conference, this court then continued the case, setting a new trial date for July 13, 2021.[7]

[On July 13, 2021, Appellant appeared for trial.] Before swearing witnesses and taking testimony, the court conducted an extensive colloquy of Appellant to determine whether she was competent to stand trial. . . . [Ultimately, the trial court concluded that Appellant understood the charges against her and was able to participate and assist in her defense. The trial] court was then satisfied that Appellant was competent to stand trial pursuant to 50 P.S. § 7402.

[At trial,] the Commonwealth presented four witnesses. Charles Palmer, an officer with the Bristol Borough Police Department, testified that back in 2018 and 2019 he lived at 435 Cedar Street, Bristol, Pennsylvania. Mr. Palmer testified that Appellant lived next door. Mr. Palmer testified to an incident on March 21, 2019, in which Appellant told Mr. Palmer that if he was not in uniform, she would "eff me up." Mr. Palmer testified that on April 16, 2018, Appellant threatened to kill his dog. Mr. Palmer testified that on August 26, 2018, that Appellant was honking her car horn repeatedly and screaming that Mr. Palmer's relationship with his daughter was inappropriate. Mr. Palmer testified to a sign Appellant posted on her front door on January 17, 2019. The sign was admitted as C-1 and the sign contains the following hand-written message: "You are a Black People OBSESSEd Evil PYHSCO Clown WASTE Your Time." Mr. Palmer testified that on January 21, 2019, Appellant called Mr. Palmer a "white N-word." Mr. Palmer also testified that on January 24, 2019, Appellant said that "if she had her gun she would have shot me on the spot."

[The Commonwealth also presented video footage from Mr. Palmer's Ring Doorbell camera and audio recordings of messages

---

[7] The transcript of this proceeding was not included in the certified record transmitted to this Court. However, the record reflects that Appellant complied with the order to undergo a mental health evaluation prior to the rescheduled trial date. *See* N.T. Trial, 7/13/21, at 15. Further, there is no indication in the record that the trial court received the completed evaluation.

that Appellant left for the Bristol Police Department. That exhibit was marked as C-2.[8]]

Officer Elifa Soto of the Bristol Borough Police Department testified about a phone call he had with Appellant on February 23, 2019, in which Appellant made complaints about Officer Palmer. Officer Soto testified that Appellant's complaints about Officer Palmer were that he was screaming through the walls and following her through the walls. Officer Soto testified that he told Appellant that Officer Palmer works the night shift at the police department and so he is most likely asleep currently. Officer Soto then testified that this explanation caused Appellant to become irate; and she began screaming and using obscenities. Specifically, Officer Soto recalled that Appellant had said that Mr. Palmer "[c]an go f*ck himself. He's the white devil."

Sergeant Peter Faight of the Bristol Borough Police Department, the affiant [in the instant case] testified to his efforts to get the mobile crisis unit of the Lenape Valley Foundation of the Lower Bucks County Hospital to treat Appellant. Sergeant Faight testified that, although the mobile crisis unit did go to Appellant's home twice, they were unable to resolve her issues and ultimately charges were filed.

Emily Palmer, the daughter of Charles Palmer, testified that for a number of years she lived with her father at the Bristol Borough

---

[8] The footage shows the Palmer residence, which is attached to multiple other row homes and located in close proximity to several nearby homes and buildings. In several of the video clips, Appellant is shown making comments and remarks at the Palmer residence at all hours of the day and night. In two videos, Appellant screams out her open door into the street. In those recordings, Appellant calls Mr. Palmer "a f**king p**sy" and then remarks "here comes another "f**king p**sy" when another neighbor exits his home and enters his vehicle. In another video, Appellant yells across the street to another neighbor, motions to Mr. Palmer's residence, and says that she wished she lived on the neighbor's block "instead of these demons."

In the audio recordings, Appellant leaves voice messages for the Bristol Police Department in which she accuses Mr. Palmer of being racist and claims that she "cussed him out" because he has been harassing and stalking her. In one message, Appellant loudly screams that "something better be done about this motherf****r," states that she "has seven brothers" and indicates that she may "retaliate" against Mr. Palmer.

address. Ms. Palmer testified that on September 9, 2019, she was sitting inside her home with the windows open when Appellant started yelling racial slurs through the window. Ms. Palmer testified that Appellant specifically yelled at her that her and Mr. Palmer "were the white devil. She was going to make our lives a living hell."

\* \* \*

Appellant testified that she moved into the Cedar Avenue Bristol Borough address in 2016. Appellant admitted on direct that she would go outside and scream, but that these outbursts were in response to what Appellant perceived to be Mr. Palmer taunting her. Specifically, Appellant testified that when she would walk about her apartment, she could hear Mr. Palmer and/or his daughter mirroring her movements on the other side of the wall, which is what Appellant says she meant by "following through the walls." Appellant denied ever threatening to kill Mr. Palmer's dog. Regarding the incident on September 9, 2019, Appellant testified that someone was tapping on the kitchen wall from 7:00 a.m. to 6:00 p.m. and that is why she eventually went outside and yelled.

Trial Ct. Op., 11/18/21, at 2-5, 6 (citations omitted, some formatting altered).

At the conclusion of the trial on July 13, 2021, the trial court found Appellant guilty of harassment and disorderly conduct. That same day, the trial court sentenced Appellant to a term of ninety days' probation, consecutive to her ninety-day probation sentence in the unrelated summary case mentioned previously. Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion addressing Appellant's claims.

On appeal, Appellant raises the following issues:

1. Did the trial court err in finding Appellant competent to stand trial?

2. Did the Commonwealth present sufficient evidence to prove the crime of disorderly conduct beyond a reasonable doubt?

Appellant's Brief at 8.

**Competency Finding**

In her first claim, Appellant argues that the trial court erred in concluding that she was competent to stand trial on July 13, 2021. *Id.* at 11.

By way of background to this claim, we reiterate that the trial court previously found that Appellant was incompetent to stand trial in November of 2020. In reaching that conclusion, the trial court relied on Dr. Tepper's opinion that Appellant's emotional state was interfering with her ability to cooperate with her attorney "in reviewing her case and preparing a rational defense." *See* Trial Ct. Op. at 2. After Appellant failed to appear for trial on May 5, 2021, the trial court granted defense counsel's request for a continuance, ordered Appellant to complete a mental health evaluation, and ultimately set a new date for trial.

On July 13, 2021, Appellant appeared with counsel for the rescheduled trial date. At that time, neither Appellant nor Appellant's counsel raised any concerns about Appellant's competency. *See* N.T. Trial, 7/13/21, at 9-10, 15. Instead, Appellant confirmed that she had completed a mental health consultation and treatment, and both Appellant and defense counsel agreed that Appellant was competent to proceed with trial at that time. *Id.* at 15-17.

After hearing from Appellant and Appellant's counsel, the trial court explained:

Before swearing witnesses and taking testimony, the court conducted an extensive colloquy of Appellant to determine whether she was competent to stand trial. First, the court explained to Appellant that the court needed to ask her questions to determine if she was competent to stand trial.[9] The court then explained to Appellant that she was facing three cases which would be heard back-to-back-to-back and that the Commonwealth was considering dismissing certain charges and downgrading certain charges to summary offenses. Appellant stated that she understood all of this. The court then explained each charge, the grading of those offenses, and the potential maximum sentences Appellant could receive if convicted, along with the difference between misdemeanor charges and summary offense charges. The court also questioned Appellant on her knowledge of [her appointed counsel,] Mr. Bastedo, to which Appellant was able to state that she knew Mr. Bastedo was an attorney with the Public Defender's Office and was representing her in these eases. The court then explained how the trials would proceed with the Commonwealth presenting their witnesses first, and then Appellant having an opportunity to present her

_____

[9] At the start of the hearing, the following exchange in part occurred:

THE COURT: I know that you went for an evaluation at my direction, by court order, to Lenape Valley's facility which is, I believe, at Lower Bucks Hospital.

[Appellant]: Yeah.

THE COURT: In any event, one of the issues that's come up in the case is that there was a somewhat dated report that indicated that there were some questions about whether you were competent under the law to proceed in this proceeding. And I want to ask you, yourself, you're now under oath, do you believe that you are competent to participate in this proceeding?

[Appellant]: I am very competent to proceed in this—

THE COURT: In this proceeding?

[Appellant]: In this proceeding.

N.T. Trial, 7/13/21, at 15.

testimony, to which Appellant stated that she understood. Having explained the nature of the proceedings to take place, the manner in which the trial would proceed, the role of Appellant's attorney, and Appellant's right to present her side of the story and having received consistent answers from Appellant that she understood everything this court explained, the court was then satisfied that Appellant was competent to stand trial pursuant to 50 P.S. § 7402.

Trial Ct. Op. at 3-4 (citations omitted, some formatting altered).

On appeal, Appellant emphasizes that the trial court explicitly stated that she "was not competent at a hearing on May 5, 2021, approximately 60 days prior to trial." Appellant's Brief at 12. Appellant contends that "[y]et, not much more than 60 days later, the court found Appellant to be competent after an on-the-record exchange with her, but without any expert guidance or testimony." *Id.* Appellant notes that while she complied with the court's order for a mental health evaluation, the result of that evaluation is not included in the record. *Id.* Further, Appellant claims that "[t]here is no subsequent expert finding that Appellant had regained competency as of July 13, 2021" and that her "rambling exchange with the trial court is insufficient to establish that she had an understanding of the nature or object of the proceedings against her." *Id.* at 15. Appellant also contends that, even if the court's competency finding was correct, the court erred by failing to make any "finding as to her ability to participate in her defense." *Id.* Therefore, Appellant concludes that the trial court erred in finding that she was competent to stand trial.

In reviewing Appellant's claim, we are guided by the following principles:

> A defendant is presumed competent and it is [her] burden to show otherwise, the determination of which is within the sound discretion of the trial court. When a competency hearing takes place, incompetency may be established by a preponderance of the evidence. 50 P.S. § 7402(d). The sensitive nature of competency determinations requires the appellate courts to afford great deference to the conclusions of the trial court, which has had the opportunity to observe the defendant personally. When the record supports the trial court's determination, we will not disturb it.

***Commonwealth v. Stevenson***, 64 A.3d 715, 720 (Pa. Super. 2013) (some citations omitted).

Our Supreme Court has explained that "where there is reason to doubt the defendant's competency, the trial court is required [to] conduct a competency hearing. Competency to stand trial, however, is measured according to a defendant's ability to understand the nature and object of the criminal proceedings and to participate and assist in his defense." ***Commonwealth v. Uderra***, 862 A.2d 74, 88 (Pa. 2004) (citations omitted); ***see also*** 50 P.S. § 7402(a) (stating that a person shall be deemed incompetent if they are "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense"); ***Commonwealth v. Hughes***, 555 A.2d 1264, 1271 (Pa. 1989) (***Hughes I***) (explaining that "a mental or physical disorder must interfere with one's ability to understand the proceedings or to assist counsel before it is sufficient to constitute incompetency" (citations omitted)).

Our Supreme Court has also stated that a competency determination is based on whether a defendant is competent at the time of trial.

*Commonwealth v. Hughes*, 865 A.2d 761, 788 n.29 (Pa. 2004) (*Hughes II*). Therefore, "[t]he fact that a defendant has experienced mental illness in the past does not *per se* render him incompetent to stand trial." *Commonwealth v. Santiago*, 855 A.2d 682, 697 (Pa. 2004); *see also Uderra*, 862 A.2d at 88 (concluding that the defendant's "unexplained temporary placement on jail suicide watch and an impulsive physical act in response to his conviction of first-degree murder" did not undermine the court's finding that the defendant was competent at the time of trial).

Here, in its Rule 1925(a) opinion, the trial court explained:

This court has been fully aware of the mental health issues that Appellant struggles with throughout this case and specifically since the November 18, 2020, evaluation from Dr. Tepper. However, the fact that Appellant struggles with mental health issues does not in and of itself render her incompetent to proceed with trial. Thus, when this court questioned Appellant on July 13, 2021, this court was focused on determining if Appellant understood the nature and the object of the proceedings against her and whether or not she felt that she could participate in her defense.

\* \* \*

As the record establishes, the court observed Appellant's behavior throughout the proceeding and observed her confer with counsel on numerous occasions throughout. As such, the court was satisfied that Appellant was competent to participate and did in fact competently participate in her defense.

Trial Ct. Op. at 9, 16 (some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court. *See Stevenson*, 64 A.3d at 720. As noted previously, the record reflects that neither Appellant nor Appellant's counsel raised any issues

regarding Appellant's competency during the rescheduled trial date on July 13, 2021. ***See id.*** (stating that "[a] defendant is presumed competent and it is [her] burden to show otherwise" (citations omitted)). In any event, the trial court conducted an extensive on-the-record colloquy during which it confirmed that Appellant was able understand the proceedings and cooperate with counsel in preparing her defense. ***See Hughes II***, 865 A.2d at 788 n.29 (reiterating that "[a] competency determination involves an assessment of a defendant's ability, at the time of trial, to consult with counsel, participate in his defense, and understand the nature of the proceedings" (citations omitted)). Ultimately, after carefully observing Appellant and considering her responses to the colloquy, the trial court concluded that Appellant was competent to proceed with trial. Given that there was no evidence establishing that Appellant was suffering from a mental disorder that interfered with her ability to understand the proceedings or assist counsel at the time of trial, ***see Hughes I***, 555 A.2d at 1271, we find no error in the trial court's conclusion. ***See Santiago***, 855 A.2d at 697 (stating that prior mental illness does not "*per se* render [a person] incompetent to stand trial").

Therefore, on this record, we find no basis to conclude that the trial court abused its discretion. ***See Stevenson***, 64 A.3d at 720; ***see also Hughes II***, 865 A.2d at 788 n.29; ***Uderra***, 862 A.2d at 88. Accordingly, Appellant is not entitled to relief.

### Sufficiency Claim

Appellant also argues that the evidence was insufficient to establish the *mens rea* element for her disorderly conduct conviction. In support, Appellant claims:

> [T]he evidence established that a mentally ill woman would say very offensive and inappropriate things to her neighbor, sometimes while she was in her own home. She was also found to have posted an offensive sign on her own door and left ranting messages on the answering machine of the local police department. While her behavior was clearly offensive and upsetting to Mr. Palmer and his family, there is no evidence that Appellant acted with the requisite intent necessary to sustain a conviction for disorderly conduct. Simply put, her conduct did not create a risk of injuries resulting from public disorder, nor did she intend to create such a risk. Furthermore, there is insufficient evidence that Appellant recklessly created a risk of a hazardous or physically offensive condition.

Appellant's Brief at 20.

The Commonwealth responds that

> [T]here is simply no question that the Commonwealth presented sufficient evidence that Appellant intended or recklessly created public hazardous or physically offensives conditions. Surely, Appellant's repeated public threats to assault and shoot Mr. Palmer created the possibility of injuries resulting from her public disorders. Moreover, conduct such as repeatedly blaring a car horn in one's neighborhood while shouting profanities and making abhorrent, false accusations and hanging hateful, disparaging signs on one's front door for all passers-by to see constitutes a direct assault on the physical senses of members of the public. . . . Appellant unequivocally engaged in an ongoing public course of disorderly conduct so severe that she essentially forced her neighbor to move out of the borough that he had lived in all of his life.

Commonwealth's Brief at 15-16.

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. R. Palmer***, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted).

Section 5503(a)(4) of the Crimes Code provides as follows:

> **(a) Offense defined.—**A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> > (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 Pa.C.S. § 5503(a)(4).

This Court has stated that the specific intent element of disorderly conduct "may be met by a showing of a reckless disregard of the risk of public inconvenience, annoyance, or alarm, even if the [defendant's] intent was to send a message to a certain individual, rather than to cause public

- 14 -

inconvenience, annoyance, or alarm." ***Commonwealth v. Troy***, 832 A.2d 1089, 1094 (Pa. Super. 2003) (citation and quotation marks omitted).

Further, this Could has explained:

Our Supreme Court has cautioned that "the offense of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people" and "it is not to be used as a dragnet for all the irritations which breed in the ferment of a community." ***Commonwealth v. Hock***, 728 A.2d 943, 947 (Pa. 1999) (citation omitted). Rather, the offense of disorderly conduct has the "specific purpose . . . to preserve the public peace." ***Id.*** (citation omitted). "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." ***Hock***, 728 A.2d at 946 (citation omitted).

In ***Commonwealth v. Williams***, 574 A.2d 1161 (Pa. Super. 1990), this Court observed that, "[a]lthough a precise definition of 'physically offensive condition' is elusive, this term encompasses direct assaults on the physical senses of members of the public." ***Id.*** at 1164; ***see also Commonwealth v. N.M.C.***, 172 A.3d 1146, 1150 (Pa. Super. 2017). We explained that a defendant can create a physically offensive condition if she invades the physical privacy of another in an extreme manner or "if she sets off a 'stink bomb', strews rotting garbage in public places, or shines blinding lights in the eyes of others." ***Williams***, 574 A.2d at 1164. Conduct that is merely morally offensive but does not affect the physical senses of another does not rise to the level of disorderly conduct. ***N.M.C.***, 172 A.3d at 1151-52; ***Williams***, 574 A.2d at 1165.

***Commonwealth v. McConnell***, 244 A.3d 44, 49 (Pa. Super. 2020) (some citations omitted).

Here, the trial court addressed Appellant's claim as follows:

While the record arguably established that Appellant's conduct was done with the intent to inconvenience, annoy or alarm Charles Palmer and Emily Palmer, such is not necessary to support Appellant's conviction. Rather, all that is required is that Appellant engaged in the statutorily prohibited conduct with the *mens rea*

of "recklessly creating a risk" of public inconvenience, annoyance or alarm.

Appellant's conduct of threatening to shoot Mr. Palmer, threatening to kill his dog, posting a sign accusing him of being racist and calling him evil and a psycho, the use of racial slurs against Mr. Palmer and his daughter and threatening to make their lives a living hell, are clearly offensive, alarming, inconvenient, and annoying or, at a minimum, clearly create such a risk. Furthermore, Mr. Palmer testified that he has since moved out of the Bristol Borough address "because the situation was beyond my handling.  I just couldn't take the constant barrage[.]"

The fact that Mr. Palmer felt the need to move to a new residence further supports this court's finding that not only were Mr. Palmer and Emily Palmer, alarmed, annoyed, and inconvenienced by Appellant's conduct, but also that Appellant acted recklessly in creating the risk of alarm, annoyance, and inconvenience.

Therefore, the evidence admitted at trial sufficiently established that Appellant committed the summary offense of disorderly conduct, 18 Pa.C.S. § 5503(a)(4).  Accordingly, this court submits that Appellant's allegation of error is without merit and should be dismissed.

Trial Ct. Op. at 19-20.

Based on our review of the record, although we agree with the trial court that there was sufficient evidence to support Appellant's conviction for disorderly conduct, we reach that conclusion on a slightly different basis.[10] *See R. Palmer*, 192 A.3d at 89.  Mr. Palmer testified that his residence was one of eight units on a block of attached row homes.  *See* N.T. Trial, 7/13/21,

_____

[10] In reaching this conclusion, we focus on the public aspects of Appellant's actions, rather than the effect that Appellant's conduct had on Mr. Palmer and his family.  However, we note that it "is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself." *Commonwealth v. Lehman*, 275 A.3d 513, 520 n.5 (Pa. Super. 2022) (citations omitted).

at 52.  At trial, Mr. Palmer and his daughter described multiple instances where Appellant screamed profanities and loudly made offensive remarks while she stood on the **public** sidewalk outside of the Palmer residence.   Although Appellant may have intended to send a message to Mr. Palmer specifically, the record reflects that by initiating these interactions in public, Appellant acted with a reckless disregard for the risk of public inconvenience, annoyance, or alarm.  ***See Troy***, 832 A.2d at 1094; ***cf. Commonwealth v. Mauz***, 122 A.3d 1039, 1042 (Pa. Super. 2015) (concluding that the evidence was insufficient to prove that the defendant acted with the intent to cause public annoyance, inconvenience or alarm, as "both the speaker and recipient of the offensive remarks were present in respective private yards").

The record also reflects that Appellant's conduct created a physically offensive condition on more than one occasion.  In one instance, Mr. Palmer testified that he was sleeping in his bed when he was awakened by Appellant, who was screaming profanities, accusing Appellant of having an inappropriate relationship with his daughter, and repeatedly honking her car horn while outside the Palmer residence.  ***See*** N.T. Trial, 7/13/21, at 41.  There is also video footage that depicts Appellant loudly screaming obscenities into the neighborhood and ultimately directing her insults at another neighbor who was entering his vehicle.  ***See id.*** at 45, Ex. C-2.  As noted previously, the Palmer residence is located in a populated residential area in which members of the public are routinely present.  Under these circumstances, we conclude that Appellant's loud outbursts were an assault "on the physical senses of

members of the public." *See Williams*, 574 A.2d at 1164 (stating that a "physically offensive condition" includes "assaults on the physical senses of members of the public"); *cf. Commonwealth v. Forrey*, 108 A.3d 895, 898-99 (Pa. Super. 2015) (reversing the defendant's disorderly conduct conviction where the Commonwealth did not show that the noise created by the defendant in a rural area and "out of hearing of any residential community or neighborhood" was "inconsistent with the standards of a recognized neighborhood or community"). Therefore, the trial court correctly concluded that there was sufficient evidence supporting Appellant's conviction for disorderly conduct. *See R. Palmer*, 192 A.3d at 89. For these reasons, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/21/2022